IN THE DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

CASE NO. 2:11-CV-1400-DCN

STEPHANIE FINNEY                                    PLAINTIFF

VS.                    <u>MEMORANDUM OPINION</u>
                          <u>AND ORDER</u>

LINCARE, INC.                                       DEFENDANT


     This matter is before the Court on Defendant Lincare,
Inc.'s Motion for Summary Judgment (Doc. 12), Defendant's Motion
to Strike (Doc. 38), its related response[1] (Doc. 40) and reply
(Doc. 43), and the parties' supplemental filings (Docs. 37, 39).
The Court heard oral argument on the Motion for Summary Judgment
by telephone on March 29, 2012 and thereafter took the motion
under submission.  (Doc. 35).

     Having reviewed the matter further, the Court now issues
the following Memorandum Opinion and Order.  For the reasons
that follow, the Motion for Summary Judgment will be granted.

### Factual and Procedural Background

     Defendant Lincare, Inc. ("Lincare") is a medical supply
company providing oxygen and other respiratory therapy services

---

[1] Included with this response was additional supplemental evidence, including
excerpts of deposition testimony.  This evidence was filed beyond the date
set by the Court for supplemental filings.  Accordingly, the Court will not
consider this evidence and, in any event, it does not change the Court's
conclusions.

and medical equipment to patients.  Lincare acquires access to patients with relevant medical needs through referrals by doctors, hospital discharge planners, and clinical case managers, and thus, its sales representatives establish relationships with these medical professionals.

Plaintiff Stephanie Finney ("Finney") interviewed for a sales representative position in February or early March 2010. She originally learned of the position through a friend, Michelle Lake, who had previously worked for Lincare as a sales representative.  (Finney Depo. at 192).  After submitting an application that reflected her prior sales experience, Finney interviewed with Stephanie Filyaw ("Filyaw"), the Myrtle Beach Center Manager, and then with Laurie Branham ("Branham"), the Area Manager.

## A.    The Interviews

During the first interview, Filyaw informed Finney that her base salary would be $24,000.  (*Id*. at 195).  Finney asked about her territory and, according to Finney, Filyaw confirmed that Finney would take over Michelle Lake's territory.  (*Id*. at 196). Filyaw also informed Finney that she would be reimbursed for her mileage, which Finney assumed would be at the standard, federal rate.  (*Id*. at 197).

According to Finney, Filyaw provided her with a document entitled "Lincare Benefit Plan and Summary for Acquisitions,"

which stated that acquired employees would have health insurance the first day of the month following the first date of employment. (*Id*. at 198-99). Finney assumed this document described her benefits.[2]

Based on Filyaw's positive recommendation, Branham interviewed Finney. Finney alleges that during this interview, which lasted only about fifteen minutes, Branham told her that she would make six figures:

> A.   Right. I knew that it was like you said, 24,000 base, the rest was commission, and I would make six figures.
>
> Q.   She didn't promise you that you were going to make six figures?
>
> A.   She told me that I ***would likely make*** six figures and gave the example of her rep in Aiken, Alison Comer, who makes six figures.

(Finney Depo. at 201-03)(emphasis added).

However, Finney admitted that her potential income was under her control:

> Q.   You understood that making six figures would be under your control, though; correct?
>
> A.   Of course.

(*Id*. at 203).

---

[2] Per the document's title, this explanation of benefits applied only to those sales representatives employed by companies acquired by Lincare. (Filyaw Depo. at 92).

Filyaw testified that she had never seen this document prior to its production during litigation, and that if she had given the document to Finney, it would have been by mistake. (*Id*. at 92-93). Filyaw did not recall giving Finney any paperwork other than a job description and remembered telling Finney only that there was health and dental insurance. (*Id*. at 59).

Conversely, Branham testified that she told Finney that she would receive a base salary of $24,000 and the opportunity to earn "uncapped commission." (Branham Depo. at 33). She denied telling Finney she would earn six figures. (*Id.* at 35).

Branham and Finney also discussed Finney's territory. Finney assumed she was taking over Michelle Lake's territory, and Branham did not correct that statement. (Finney Depo. at 252). However, Finney was never promised a territory for any specific period of time. (*Id.* at 256).

**B.    Position Accepted**

Lincare offered Finney the sales position, which she accepted.[3] On Finney's first day, she received an employee handbook, which detailed several policies and procedures, including employee eligibility for benefits. (*Id.* at 207). It provided that an employee was eligible for dental insurance after one year of company service and health insurance after ninety days of service. (Doc. 12-6, at 3).

Finney signed an acknowledgement that she read the handbook. The acknowledgement expressly stated that it did not create an employment contract for a specified time period, that Lincare reserved the right to change the policies contained

---

[3] At that time, she had received only one other employment offer, which she declined when she accepted Lincare's offer. (*Id.* at 225).

therein, and that such changes could be implemented even if not communicated to employees.[4]  (Doc. 12-4, Acknowledgment, at 29).

Finney also received a commission structure that detailed her base salary, the commissions paid on types of sales, and when the commission would be paid.[5]  (*See* Finney Depo. at 27-28). The commission structure did not reference a six-figure income.

## C.    **Issues Arise**

After Finney began working, she had several complaints regarding her employment, but the primary complaint was her salary.  Based on her interviews, Finney believed she would earn six figures.  Then, during a training session, Finney was shown a slide reflecting that the possible salary for her territory was $87,840.  (*Id*. at 239); (Doc. 12-3, at 14).

However, after beginning to make sales calls, Finney quickly concluded that these salary projections were unrealistic because there was not enough business in the territory.  (Finney Depo. at 240).

Other former sales representatives for Lincare also testified that Branham had told them they would make six

_____

[4] Finney admitted that, although she has read parts of the handbook, she has not read it word for word.  (Finney Depo. at 208).

[5] Although Branham testified that she routinely gives all interviewees a copy of the job description, the commission structure, and a benefit summary, she could not recall whether she provided these documents to Finney.  (Branham Depo. at 32).  Finney testified that she did not receive the commission structure until after she had accepted the offer.  (Finney Depo. at 202). For purposes of this Motion, the Court accepts Finney's testimony that she did not receive the commission structure until after she was hired.

figures, which they also concluded was unrealistic. Sharon Faulk ("Faulk") and Tim Whitis ("Whitis") previously worked as sales representatives for Lincare.[6] Both submitted affidavits averring that Branham told them they would earn six figures as a sales representative. (*Id.*, Faulk Aff., at ¶ 2); (*Id.*, Whitis Aff., at ¶ 3). Faulk further testified that Branham stated that other sales representatives earned this salary, including Allison Comer. (*Id.*, Faulk Aff., at ¶¶ 2-3). However, Faulk confirmed with Comer that this statement was false, and both Faulk and Whitis testified that no other South Carolina representatives made six figures. (*Id.*, Faulk Aff., at ¶ 6); (*Id.*, Whitis Aff., at ¶ 5). The most Faulk could recall earning was $70,000. (*Id.*, Faulk Aff., at ¶ 5).

However, both Branham and Filyaw testified that a sales representative from Asheville earned six figures. (*See* Branham Depo. at 36); (Filyaw Depo. at 58).

Finney was also dissatisfied with her territory. After she began, she learned that she would not have Michelle Lake's territory and instead would be splitting territory with another representative. (Finney Depo. at 241).[7]

---

[6] Both were terminated from Lincare's employ for misconduct. (Doc. 37, Faulk Aff., at ¶ 8); (*Id.*, Whitis Aff., at ¶ 8).

[7] Finney conceded that this representative was actually employed by Lincare first, and so he was splitting his territory with her. (*Id.*). After this representative left, which was shortly after Finney began, she took over his territory. (*Id.* at 249).

Finney further learned that she was not immediately eligible for health insurance or dental insurance. (*Id.* at 248). As a result, she incurred expenses for several appointments and pharmacy prescriptions. (*Id.* at 262-63).

Additionally, Finney discovered that she would not be receiving the standard federal rate of reimbursement for mileage, and that the reimbursement rate changed after a certain number of miles. (*Id.* at 206, 259).

After approximately eight months, Finney resigned, feeling that she was being "set up to look like a non-producer." (*Id.* at 264). Despite the fact that she was a "top" sales representative,[8] she only earned $30,000 during her employment with Lincare.[9]

## D.    **Procedural History**

Finney filed this action in state court on April 25, 2011, and Lincare removed on June 8, 2011. (Doc. 1). The instant Motion for Summary Judgment was filed on December 29, 2011.

After hearing oral argument, the Court permitted the filing of supplemental evidence. Finney filed two affidavits (*see* Doc.

---

[8] Finney admitted that Lincare never formally recognized her as one of its tops sales representatives. (*Id.* at 223-24). Her statement is based on recognition given to her by her managers and her comparison of her performance to that of other sales representatives. (*Id.*).

[9] Finney was in training during the first two months of her employment, and so she only actually worked her territory for six months. (Filyaw Aff. at ¶ 26). Additionally, Lincare contends that Finney took a lot of unpaid time off. (Filyaw Depo. at 102).

37), and Lincare filed a Motion to Strike one of the affidavits (Doc. 38), as well as a supplemental memorandum addressing several points discussed during oral argument (Doc. 39).

*Analysis*

**A.    <u>The Summary Judgment Standard</u>**

Rule 56(a) of the Federal Rules of Civil Procedure provides in relevant part that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under Rule 56, the moving party bears the burden of proving that no genuine issue of material fact exists, and the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Ultimately, the court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.    <u>Lincare's Motion to Strike</u>**

Lincare moves to strike the affidavit of Sharon Faulk on the basis that Faulk was never identified as a potential witness as required by Federal Rule 26(a)(1)(A)(i), nor did Finney

supplement the disclosures to identify Faulk as a witness as required by Rule 26(e).

Rule 37(c)(1) prohibits a party from using evidence that it failed to provide during discovery unless the failure was substantially justified or is harmless. The Fourth Circuit provides five factors to consider when determining whether such evidence should be excluded under Rule 37(c)(1): (1) surprise, (2) ability to cure the surprise, (3) extent to which allowing the evidence disrupts the trial, (4) importance of the evidence, and (5) the nondisclosing party's explanation for failure to disclose. *See Blankson-Arkoful v. Sunrise Senior Living Servs., Inc.*, 449 F. App'x 263, 265 (4th Cir. 2011).

Several of these factors weigh against considering the affidavit. Because Finney failed to identify Faulk as a potential witness in this case, her affidavit is a surprise to Lincare. As discovery has closed, Lincare cannot depose Faulk, which precludes Lincare from curing the surprise.

However, the affidavit appears to be largely duplicative of other evidence already in the record. Accordingly, while Lincare might not have known that Faulk was a potential witness, it had notice of the type of evidence offered by Faulk in her affidavit. Therefore, Finney's failure to identify Faulk as a witness was harmless, and the Motion to Strike is denied.

C.    **Finney's Claims**

Finney asserts seven causes of action in her Complaint: (1) negligent misrepresentation; (2) fraud; (3) constructive fraud; (4) failure to pay commissions; (5) breach of contract; (6) breach of contract accompanied by a fraudulent act; and (7) unjust enrichment.

1.    **Negligent Misrepresentation, Fraud, and Constructive Fraud Claims**

Finney's tort claims are based on four representations allegedly made during her interviews.[10]  These representations relate to Finney's:  (1) salary; (2) territory; (3) mileage reimbursement rate; and (4) eligibility for benefits.

To establish a claim of negligent misrepresentation, a plaintiff must demonstrate that: (1) a false representation was made, (2) the defendant had a pecuniary interest in making the statement, (3) the defendant owed a duty of care to communicate truthful information, (4) the defendant breached this duty, (5) the plaintiff justifiably relied on the representation, and (6) the plaintiff suffered a pecuniary loss as a result of her reliance on the representation. *See Sauner v. Pub. Serv. Auth. of S.C.*, 581 S.E.2d 161, 166 (S.C. 2003).

To establish a claim of fraud, a plaintiff must demonstrate: (1) a representation, (2) that was false, (3) and

---

[10] While Lincare disputes whether these representations were made, for purposes of this motion, Finney's version of events must be accepted.

material, (4) that defendant knew of the falsity or acted with reckless disregard as to its truth or falsity, (5) and intended that the plaintiff would act upon the representation, (6) plaintiff was ignorant of its falsity, (7) relied on its truth, (8) had the right to rely thereon, and (9) was injured as a result of this reliance.[11] *See Turner v. Milliman*, 708 S.E.2d 766, 769 (S.C. 2011).

Because Finney fails to establish at least one of the elements as to each of her claims, summary judgment as to these claims is appropriate.

### a.    Representation that is False

Under each of these claims, a plaintiff must demonstrate a representation that was false. *See id.* at 770. "The general rule is that [torts based on misrepresentation] must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Tom Hughes Marine, Inc. v. Am. Honda Motor Co., Inc.*, 219 F.3d 321, 324-25 (4th Cir. 2000)(quoting *Woodward v. Todd*, 240 S.E.2d 641, 643 (S.C. 1978)). An exception to this rule exists if the plaintiff can demonstrate that the defendant never intended to fulfill its promise, rendering the representation false when made. *See id.; Turner*, 708 S.E.2d at 770.

---

[11] To establish a claim of constructive fraud, a plaintiff must demonstrate all elements of actual fraud except intent. *See Woods v. State*, 431 S.E.2d 260, 263 (S.C. Ct. App. 1993).

First, as to Finney's claim that Lincare represented that she would earn $.31 per mile, she provides no evidence that Lincare made any representation regarding her mileage reimbursement rate.  In fact, Finney's testimony was that she **assumed** that she would receive the federal mileage rate. (Finney Depo. at 197).  Based on Finney's testimony, Lincare never represented that Finney would be reimbursed for mileage at a specific rate, and Finney's claims based on her mileage rate must fail.

The other statements on which Finney bases her claims, those regarding her salary, benefits, and territory, relate to the future terms of Finney's employment.  As these statements relate to future events, they are not actionable.  *See Tom Hughes Marine, Inc.*, 219 F.3d at 325 (concluding statements promising exclusivity to a dealer concerned a future event and thus were not actionable); *Sauner*, 581 S.E.2d at 167 (finding that a statement that a defendant would take certain steps in the future was not actionable); *Jones v. Cooper*, 109 S.E.2d 5, 10 (S.C. 1959) (deciding that statements regarding a possibility of profit constituted mere opinion and thus was not actionable).

Additionally, the exception regarding representations of future events does not apply because Finney provides no evidence

that the statements regarding her salary, benefits, or territory were false when made.[12]

With regards to the alleged representation that Finney would make six figures, the record reflects that at least one sales representative in the region had earned six figures, and so Branham's statement that other representatives could also reach this goal cannot be deemed false when made.[13]

During the telephonic hearing, Finney made much of the fact that Branham used Allison Comer as an example of a representative who made such a salary, which she contends is false. Accepting Finney's contention that Comer did not, in fact, earn six figures,[14] the record demonstrates that at least one sales representative did earn six figures, and Finney offers no evidence to refute this testimony.[15] Therefore, the fact that

---

[12] Finney even testified that she believed Branham's statements regarding her sales position were based on "honest opinions." (Finney Depo. at 203). Therefore, these statements were not false when made. *See Tom Hughes Marine*, 219 F.3d at 326 (recognizing that the plaintiff's testimony that he had no information regarding the defendant's intent at the time the statements were made defeated his contention that the statements were false when made).

[13] Moreover, Finney's testimony that Branham stated that "[Finney] would likely make six figures" is more akin to a statement of opinion, not of fact, which is not actionable. *See Bishop Logging Co. v. John Deere Indus. Equip.*, 455 S.E.2d 183, 187 (S.C. Ct. App. 1995) (recognizing that the representation must be a statement of fact, not opinion).

[14] While Finney contends that Comer never made six figures, she supports this contention only with statements by other employees that Comer stated she did not earn six figures. However, that testimony is hearsay. Because Finney failed to provide an affidavit from Comer, the record does not definitively reflect that Comer did not, in fact, make six figures.

[15] Finney's supplemental affidavits both state that no other *South Carolina* sales representative made six figures. Even accepting these statements as true, the representative named by Branham and Filyaw was from Asheville,

Comer did not earn six figures is irrelevant because at least one other sales representative did.

Furthermore, Branham never promised that Finney would earn six figures in her first year. Finney was admittedly there less than a year, so it is unclear what she would have actually made during that first year and in the years to follow. Presumably, there is a learning curve to the position and establishing her presence in the territory would likely require some time. Finally, nothing demonstrates that Lincare did not intend to pay Finney six figures if her sales justified such commissions. Therefore, Finney fails to establish the statement regarding her salary was false when made.

Additionally, the alleged misrepresentation regarding Finney's eligibility for benefits is based only on a document received during her first interview. Assuming that providing Finney with this document constituted a representation, the document appears to correctly reflect Lincare's policy as to benefits for *acquired* employees, as stated by the document's title. Therefore, as the information contained in the document was true, these representations were not false.

Finney also provides no evidence that any statements regarding her territory were false when made. Finney's argument that Lincare's decision to split her territory with another

_____

which is in *North Carolina*, and so these affidavits do not refute the testimony that at least one sales representative earned six figures.

representative demonstrates that the statement regarding her territory was false when made fails.  As Finney's complaint relates to the geographic location of her territory, not that it was shared with another representative, Lincare's decision to establish two representatives in a given territory in no way establishes that any representations as to Finney's potential territory were false when made.

Because Finney fails to establish that any of the statements regarding her salary, eligibility for benefits, or territory were false when made, these statements relate to future events and are thus not actionable.

### b.    Unjustified Reliance

Additionally, even if these statements were actionable, Finney's reliance on these representations was not justified.

It is well-settled that when the truth of potential misrepresentations is within the reach of the plaintiff, she has no right to rely on the representation.  *See Jones*, 109 S.E.2d at 11. "There is no liability for casual statements, representations as to matters of law, or matters which plaintiff could ascertain on his own in the exercise of due diligence." *AMA Mgmt. Corp. v. Strasburger*, 420 S.E.2d 868, 874 (S.C. Ct. App. 1992).

With regard to the statement that she would make six figures, Finney received her commission structure upon beginning

with Lincare.  That structure did not promise six figures; it merely stated she would be paid a base salary plus commissions. After receiving this commission structure, which clearly provided her compensation structure, Finney had no right to rely on a casual statement made once during a short interview.

Moreover, Finney's admission that her salary was within her control renders any reliance on the "six figures" statement unjustifiable.  Finney had worked in sales previously and was familiar with the fact that salaries of sales representatives largely depend on the sales made.  In fact, she testified that she "knew that [she] had the opportunity to control [her] own financial destiny," which was what appealed to her about sales. (Finney Depo. at 12).  Nothing suggests that she was limited in her ability to earn sales.  (*See* Doc. 39-3, Job Description, at 2) (noting one of her responsibilities was to develop referral sources).  Therefore, her admission that her salary was within in her control renders reliance on the representation she would make six figures unjustified.

With regards to Finney's eligibility for benefits, the employee handbook expressly detailed the timing of her eligibility for benefits, and Finney has conceded that she had access to this information early in her employment.  (Finney Depo. at 218-19).  She also admitted confusion as to the title of the benefits document received during her first interview,

16

yet she never sought clarification of its application to her. (*Id.* at 243). Had she taken steps to protect her interests by either reading the handbook or seeking clarification, she could have obtained health insurance through an alternative source or delayed medical expenses. Lincare cannot be held liable for Finney's failure to protect her own interests. *See AMA Mgmt. Corp.*, 420 S.E.2d at 874.

Furthermore, it was not reasonable for Finney to rely on any representation regarding her sales territory. The record includes testimony that territories can change constantly, (*see* Doc. 39-5, Payne Aff., at ¶ 9), and Finney admits that she was never promised a territory for a specific time period. (Finney Depo. at 256). Therefore, even if Finney was originally told that she would receive Michelle Lake's territory, she was not justified in assuming that this territory assignment would last for any specific period of time.

Therefore, as Finney fails to demonstrate the existence of an actionable false representation or justified reliance, her claims of negligent misrepresentation, fraud, and constructive fraud fail.

### 2. Failure to Pay Commissions Claim

Finney asserts that she is owed commissions under the Sales Representatives Act ("the Act"). *See* S.C. Code Ann. §§ 39-65-10 to -80. The Act requires payment of all commissions owed under

a contract between a sales representative and a principal. *See id.* § 39-65-20.

A "principal" is one who: "(a) manufactures, produces, imports, or distributes a tangible product for wholesale;  (b) contracts with a sales representative to solicit orders for the product; and (c) compensates the sales representative, in whole or in part, by commission." *Id.* § 39-65-10(3).

A "sales representative" is one who: "(a) contracts with a principal to solicit wholesale orders; (b) is compensated, in whole or in part, by commission; (c) does not place orders or purchase for his own account or for resale; and (d) does not sell or take orders for the sale of products to the ultimate consumer." *Id.* § 39-65-10(4).

Although not defined by the Act, the South Carolina Court of Appeals has interpreted the term "wholesale" to mean "[t]he sales of goods or commodities [usually] for resale by a retailer, as opposed to a sale to the ultimate consumer." *Lee v. Thermal Eng'g Corp.*, 572 S.E.2d 298, 304 (S.C. Ct. App. 2002) (quoting Black's Law Dictionary 1591 (7th ed. 1999)).  The court concluded that this statute narrowly applies only to sales representatives soliciting wholesale orders. *See id.*

In light of this narrow interpretation, Finney is not a "sales representative" because she did not solicit wholesale orders.  Instead, she solicited referrals from doctors for the

sale of oxygen and other respiratory equipment to the ultimate consumers: the patients.  Therefore, because the sale was to the ultimate consumer, Finney falls squarely outside the definition of "sales representative,"[16] and this claim fails.

### 3.  Breach of Contract Claim

Finney also asserts a breach of the contract created by "the Employee Handbook, Benefit Plan Summary, Salary and Commission Projections, and other orally communicated materials."  (Complaint at ¶ 38).

South Carolina follows the general theory of at-will employment.  *See Mathis v. Brown & Brown of S.C., Inc.*, 698 S.E.2d 773, 778 (S.C. 2010).  When the employment contract is one for an indefinite term, it is usually a unilateral contract,[17] and all terms and conditions of employment can be changed prospectively.  *See Wadford v. Hartford Fire Ins. Co.*, CIV. A. 3:87-2872-15, 1988 WL 492127, at *4 (D.S.C. Aug. 11, 1988); *Facelli v. Se. Mktg. Co.*, 327 S.E.2d 338, 339 (S.C. 1985).

---

[16] Even if the Act applied to Finney, she has failed to provide any evidence that these commissions were actually owed to her.  She argues only that whether commissions are owed constitutes a question of fact for the jury.  However, at the summary judgment stage, Finney must provide evidence to establish the existence of a triable issue of fact.  *See* Fed. R. Civ. P. 56(c).  Finney has offered nothing more than her testimony that such commissions were owed, and thus she has failed to carry this burden.

[17] Unilateral contracts require: (1) a specific offer; (2) communication of the offer to the employee; and (3) performance of the job duties in reliance of the offer.  *See Small v. Springs Indus., Inc.*, 357 S.E.2d 452, 454 (S.C. 1987) (describing at-will employment as a unilateral agreement); *Prescott v. Farmers Tel. Coop.*, 516 S.E.2d 923, 926 (S.C. 1999) (recognizing that most employment agreements are unilateral).

Under South Carolina law, to alter the at-will status, a policy or representation must limit the duration of the employment or the employer's right to terminate. *See Wadford*, 1988 WL 492127, at *4.

Here, the employee handbook contained a clause expressly stating it did not create an employment contract for a definite period and further reserving the right to alter the policies at any time. (*See* Doc. 12-6). Accordingly, the handbook did not alter Finney's at-will employment status. *See Toomer v. S.C. Bank & Trust*, Civ. Action No. 5:06-2337-RBH, 2008 WL 725792, at *14 (D.S.C. Mar. 17, 2008) (concluding that an employee handbook containing a disclaimer and lacking mandatory language did not create an employment contract for a definite time).

Therefore, because Finney was an at-will employee, the terms of her employment could be changed prospectively at any time. *See Wadford*, 1988 WL 492127, at *4; *Facelli*, 327 S.E.2d at 339.

Regardless of what representations were made during Finney's interviews, when she began her employment, Finney received information changing these terms. Specifically, she received: (1) a commission structure explaining how she would be compensated, which did not reference a six-figure salary; (2) an employee handbook which detailed her eligibility for

benefits;[18] and (3) her territory assignment.  Finney signed both

this commission structure and the employee handbook,

acknowledging her receipt and understanding of the documents.[19]

Finney's performance after receiving these documents, which

changed the terms of her employment from what was described

during her interview, demonstrated her acceptance of Lincare's

offer of employment on these terms.[20]  *See Facelli*, 327 S.E.2d at

339.  *See also Matthews v. City of Greenwood*, 407 S.E.2d 668,

670 (S.C. App. 1991) (concluding, in an at-will employment

situation, that an employee "impliedly consents to changed

---

[18] Furthermore, the document Finney allegedly received regarding benefits does not constitute a term of the employment contract because it did not apply to her.  Per its title, it applied only to acquired employees, and it is undisputed that she was not a acquired employee.  *See Wadworth*, 1988 WL 492127, at *8 (recognizing that a document which plainly did not apply to the plaintiff could not be construed as making a promise to that plaintiff).

[19] Finney's contention that she was unaware of these changes does not affect their applicability to her.  She admits that she had access to this material, and she even signed acknowledgements as to each.  It is her responsibility to read such documents, and the fact that she failed to do so does not provide a basis for a breach of contract claim.

[20] Finney's argument that by objecting to her salary she did not consent to the term fails.  *See Matthews*, 407 S.E.2d 668 (concluding that continued employment, even while objecting to the changed term, constitutes acceptance of the term in an at-will situation). Finney's reliance on *Mathis* is misplaced.  In that case, the court concluded that the parties had an employment contract for a definite time.  *See Mathis*, 698 S.E.2d at 779. Therefore, any modifications to that bi-lateral contract had to be supported by consideration.  *See id*.
  Additionally, while the *Mathis* court did conclude that there was a genuine issue of fact as to whether Mathis consented to the compensation reduction by continuing his employment because he objected to the reduction, that conclusion was limited to the facts of the case.  *See id*. at 780.
  In the case at hand, the employment agreement was not a bi-lateral contract, but was rather a unilateral contract.  Therefore, Finney's continued performance constituted acceptance of Lincare's offer of employment on Lincare's choice of terms.  *See Facelli*, 327 S.E.2d at 339.

compensation by continuing to work under the new arrangement"
even if he initially complained about the change).

Accordingly, as these were the terms Finney accepted
through her performance, there was no breach of contract,[21] and
this claim must fail.[22]

### 4.    Breach of Contract Accompanied by a Fraudulent Act

As no breach of the contract occurred, this claim fails.
*See Ball v. Canadian Am. Express Co*., 442 S.E.2d 620, 623 (S.C.
Ct. App. 1994) (recognizing that to establish this claim, a
plaintiff must show fraudulent intent relating to the breach).

### 5.    Unjust Enrichment

Finney contends that she is entitled to recover the amount
of commissions that were improperly paid to another sales
representative and the value of the benefits which were
improperly delayed under a theory of unjust enrichment.[23]

---

[21] In light of this conclusion, the Court will not address the parties'
argument that the benefit summary was not a term of the contract due to
mistake.

[22] To the extent Finney argues that the mileage reimbursement rate constitutes
a breach of contract, because Lincare made no representations to Finney as to
her reimbursement rate, the rate in place at the time Finney began
performance constitutes the term of the contract.
    Additionally, in her Complaint, Finney contends that Lincare breached
the employment contract by incorrectly allocating customers developed by
Finney to another representative and failing to pay Finney owed commissions.
Even assuming that these are terms of the contract, Finney fails to provide
any evidence that Lincare either incorrectly allocated customers or owes
Finney commissions.  *See* Fed. R. Civ. P. 56(c) (providing that a party must
provide evidence supporting her claims and cannot rely on mere assertions).

[23] To recover under this theory, a plaintiff must demonstrate: (1) conferral
of a nongratuitous benefit on the defendant; (2) the defendant realized some
value from the benefit; and (3) it would be inequitable to allow the
defendant to retain the benefit without paying the plaintiff its value.  *See*

However, Finney fails to provide any evidence, other than mere assertions, that she is owed commissions, which is insufficient to survive a motion for summary judgment. *See* Fed. R. Civ. P. 56(c); *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir. 1991). Additionally, Lincare provided Finney with health insurance when she was eligible per the policy provided in the employee handbook. Therefore, the benefits were not delayed, and Lincare's actions were consistent with the applicable provisions of the employee handbook. Therefore, this claim fails.

### *Conclusion*

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that Lincare's Motion to Strike (Doc. 38) be, and is hereby, **DENIED.  IT IS FURTHER ORDERED** that Lincare's Motion for Summary Judgment (Doc. 12) be, and is hereby, **GRANTED.**  A separate judgment shall enter concurrently herewith.

This 1st day of May, 2012.



**Signed By:**

*William O. Bertelsman*  WOB

**United States District Judge**

---

*Moore-Hudson Oldsmobile/GMC, Inc. v. Waterman*, 378 S.E.2d 279, 280 (S.C. Ct. App. 1989).